*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

---

## GATEWAY CITY CHURCH, et al.,

*Plaintiffs-Appellants,*

v.

## GAVIN NEWSOM, et al.,

*Defendants-Appellees.*

---

*Appeal from a Decision of the United States District Court for the Northern District of California, No. 5:20-cv-08241-EJD · Honorable Edward J. Davila*

## APPELLANTS' OPENING BRIEF

SHARONROSE CANNISTRACI, ESQ.
CANNISTRACI LAW FIRM
236 North Santa Cruz Avenue, Suite 217
Los Gatos, California 95030
(480) 307-5662 Telephone

MARLIS D. MCALLISTER, ESQ.
MCALLISTER LAW GROUP
Post Office Box 756
Pine, Colorado 80470
(650) 346-3792 Telephone

KEVIN T. SNIDER, ESQ., *Counsel of Record*
EMILY C. MIMNAUGH, ESQ.
PACIFIC JUSTICE INSTITUTE
9851 Horn Road, Suite 115
Sacramento, California 95827
(916) 857-6900 Telephone

*Attorneys for Appellants Gateway City Church, Orchard Community Church of Campbell, The Home Church, Inc., The Spectrum Church, San Francisco Bay Area, Inc. and Trinity Bible Church*




## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1(a), Plaintiffs-Appellants, Gateway City Church, The Home Church, The Spectrum Church, Orchard Community Church, and Trinity Bible Church each state they are domestic nonprofit corporations incorporated under the laws of the State of California, none of which have a parent corporation, or issue stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ............................................................................................ iii

ISSUES PRESENTED FOR REVIEW ........................................................................... 1

STATEMENT OF JURISDICTION ............................................................................... 1

STATEMENT OF THE CASE ......................................................................................... 1

SUMMARY OF THE ARGUMENT .............................................................................. 3

STATEMENTS OF FACTS .............................................................................................. 5

INTRODUCTION ............................................................................................................. 12

ARGUMENT ...................................................................................................................... 12

    I.    THE STATE AND COUNTY AIRPORT EXEMPTIONS ARE SUBJECT
        TO STRICT SCRUTINY ................................................................................. 13

        A.    The State's Public Health Orders Are Not Narrowly
               Tailored Because They Exempt Airport Gates Which
               Are A Similarly Situated Comparator to Church Services ............ 16

               i.    The State's Claim of Narrow Tailoring ............................... 17

               ii.    The County's Claim of Narrow Tailoring ........................... 18

        B.    The Basis for the State and County Exceptions for
               Gatherings at Airports Due to Singing at Churches is
               Belied by the Fact That These Jurisdictions Create Singing
               Exceptions in Other Industries ....................................................... 19

        C.    The Lower Court Failed to Apply the Least Restrictive
               Means Element to Narrow Tailoring ............................................... 23

        D.    Both the State and County Have Jurisdiction over Airports ........ 24

II.    The County's Ban on Indoor Worship Services is Subject to Strict Scrutiny Because it is Neither Neutral nor Generally Applicable ................................................................. 25

III.   The Churches Face Irreparable Harm by the Continued Exclusion of Congregants from Indoor Worship Services ...... 32

IV.   The Balance of Hardship and Public Interest Merge ................. 33

CONCLUSION ........................................................................................... 35

STATEMENT OF RELATED CASES ..................................................... 37

CERTIFICATE OF TYPE SIZE AND STYLE ........................................ 37

CERTIFICATE OF COMPLIANCE .......................................................... 37

CERTIFICATE OF SERVICE .................................................................... 38

# TABLE OF AUTHORITIES

## CASES

*Calvary Chapel Dayton Valley v. Sisolak,*
   982 F.3d 1228 (9th Cir. 2020) ..................................................................11, 15, 33

*Calvary Chapel Dayton Valley v. Sisolak,*
   591 U.S. ___ , 140 S. Ct. 2603 (2020) ...........................................................13, 15, 30

*Church of Lukumi Babalu Aye v. City of Hialeah,*
   508 U.S. 520 (1993) .............................................................................. 16, 26, 28, 32

*College Republicans at San Francisco State University v. Reed,*
   523 F. Supp. 2d 1005 (N.D. Cal. 2007) ....................................................... 34

*Elrod v. Burns,*
   427 U.S. 347 (1976) ...................................................................................... 32

*Emp't Div., Dep't of Human Res. Of Or. v. Smith,*
   494 U.S. 872 (1990) ...................................................................................... 15

*KH Outdoor, LLC v. City of Trussville,*
   458 F.3d 1261 (11th Cir. 2006) .................................................................... 35

*McDaniel v. Paty,*
   435 U.S. 618 (1978) ................................................................................26, 28

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ....................................................................... 35

*Montalvo v. Spirit Airlines, et al.,*
   508 F.3d 464 (9th Cir. 2007) ....................................................................... 24

*Nken v. Holder,*
   556 U.S. 418 (2009) ...................................................................................... 33

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
   590 U.S. ___ , 141 S. Ct. 63 (2020) ........................................................*passim*

iv

*Sammartano v. First Jud. Dist. Ct.,*
    303 F.3d 959 (9th Cir. 2002) ........................................................ 34

*South Bay Pentecostal Church v. Gavin Newsom,*
    985 F.3d 1128 (9th Cir. Jan. 22, 2021) ...................................... 11, 17

*South Bay United Pentecostal Church v. Gavin Newsom,*
    No. 20-56358, 2021 WL 222814 ................................................. 13

*South Bay United Pentecostal Church v. Gavin Newsom,*
    590 U.S. ___ , 140 S. Ct. 1613 (2020) ................................ 10, 11, 15, 34

*South Bay United Pentecostal Church, et al. v. Gavin Newsom, et al.,*
    592 U.S. ___ (Feb. 5, 2021) No. 20A136 (20-746) .............................*passim*

*Thomas v. Review Bd. of Indiana Employment Sec. Div.,*
    450 U.S. 707 (1981) .................................................................. 23

*Turner Broadcasting System, Inc. v. FCC,*
    507 U.S. 1301 (1993) ................................................................ 33

## RULES

28 U.S.C. § 1292(a)(1) ................................................................. 1

28 U.S.C. § 1331 ......................................................................... 1

28 U.S.C. § 1651(a) ..................................................................... 33

42 U.S.C. § 1983 ......................................................................... 1

49 U.S.C. § 40103(a)(2) ............................................................... 24

## OTHER AUTHORITIES

Douglas Laycock & Steven T. Collis, *Generally Applicable Law and the Free Exercise of Religion*, 95 Neb. L. Rev. 1, 22 (2016) ........................................... 15

Katey Rusch, *How Do You Enforce a Law That Tramples the Land of the Free?*, THE NEW YORK TIMES (May 11, 2020), https://www.nytimes.com/2020/05/11/us/coronavirus-california-lockdowns.html ........................................ 12, 35

# ISSUES PRESENTED FOR REVIEW

1.      In view of the California and the County of Santa Clara's exemption for gatherings at airport gates, are the percentage capacity restrictions on places of worship constitutional under the First Amendment?

2.      Is the County of Santa Clara's complete prohibition on indoor worship services constitutional under the First Amendment?

# STATEMENT OF JURISDICTION

The U.S. District Court for the Northern District of California had original jurisdiction over this case under 28 U.S.C. § 1331, in that the Complaint alleged violations of the United States Constitution actionable under 42 U.S.C. § 1983.

This appeal arises from an order denying in part a preliminary injunction, and therefore this Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).  The District Court's order denying in part the preliminary injunction was entered on January 29, 2021.  Volume 1, Excerpts of Record ("ER") at pages 2-31.  The Plaintiffs filed a notice of appeal on February 1, 2021. 17-ER-4483-4485.

# STATEMENT OF THE CASE

The Plaintiff-Appellants, Gateway City Church, The Home Church, The Spectrum Church, Orchard Community Church, and Trinity Bible Church (collectively "Churches") filed suit in the Northern District of California on November 23, 2020, against Governor Newsom and Sandra Shewry, Acting California Director of Public Health (collectively "State"), and the County of Santa

1

Clara and Sarah Cody, Santa Clara County Public Health Director (collectively "County"). On November 27, the Churches filed an application for a temporary restraining order and order to show cause why a preliminary injunction should not issue. 1-ER-5. The District Court denied the application on December 2, set a status conference for December 7 and ordered briefing on recent decisions from the United States Supreme Court and this Court. *Id.*

On December 9, the Churches filed an amended complaint and motion for preliminary injunction against the State and County Defendants. 11-ER-2711-17-ER-4435. The motion was granted in part and denied in part on January 29, 2021; the District Court enjoined enforcement of the State Defendants' 100 and 200-person capacity limits for places of worship in Red Tier 2 and Orange Tier 3 but not the percentage-based capacity limitations of any tier. 1-ER-30. The District Court denied the motion as to the complete ban on indoor worship services under Purple Tier 1. *Id.* Injunctive relief against the County restrictions on gatherings was also denied. 1-ER-31. A notice of an interlocutory appeal was filed on February 1. 17-ER-4483-4485.

On February 2, a motion for an injunction pending appeal was filed in the District Court. 2-ER-79-91. The United States Supreme Court handed down a decision addressing the State-Defendants' restrictions on indoor religious gatherings on February 5. *South Bay United Pentecostal Church, et al. v. Gavin Newsom, Governor of California, et al.*, 592 U.S. ___ (Feb. 5, 2021) No. 20A136 (20-746) (*South Bay II*). On

2

February 6, the Churches filed a notice of recent decision with the District Court which included a copy of the *South Bay II* decision. 2-ER-57-73. On Monday, February 8, the District Court granted the Churches' motion enjoining **both** the State and County Defendants, allowing the Churches to meet at **25% capacity** in compliance with *South Bay II*. 2-ER-53-56. The County changed its public health order to allow places of worship to meet, but only at **20% capacity.** The following day, (Feb. 9) the County filed a motion for leave to file a motion for reconsideration. 2-ER-40-52. Late on the night of February 10, the District Court granted the County's motion and stayed its order granting the injunction pending appeal. 2-ER-33-34. The next day (Feb. 10), the County rescinded its 20% gathering rule for places of worship and set them back to **0% capacity** for indoor worship services.

The Churches filed a motion with this Court seeking an injunction pending appeal on an emergency basis. This Court denied the motion on February 12. The Churches filed an application for an emergency writ of injunction on February 17 with the Supreme Court which was granted on February 26.

## SUMMARY OF THE ARGUMENT

The Churches are likely to succeed on the merits because the orders limiting gatherings for places of worship exempt a similarly situated comparator. Both State and County orders do not limit indoor congregating by the public at airline gates as passengers wait to board their flights. Gatherings at gates are nearly identical to weekend religious services in terms of time (60-90 minutes), number of persons (120-

400), and physical space. Hence, the restrictions on indoor worship are not generally applicable in view of the airport exemption.

Because the public health orders are not neutral and generally applicable, they are subject to strict scrutiny review such that the government must demonstrate a compelling interest that is narrowly tailored. Though courts have determined that the spread of the coronavirus is an interest that is compelling, the orders are not narrowly tailored for the same reason that they are not generally applicable. The exemption for airports shows the public health orders are not applied to all persons, in all places, at all times. Further, if the government interest is to stem a contagious disease, the airport exemption for public gatherings works at cross purposes to that goal. In other words, the challenged health orders are underinclusive because they do not reach passengers at airport gates. The health orders are also overinclusive because they prohibit more activity (i.e., religious services) than necessary to prevent the spread of the novel coronavirus ("COVID-19").

The District Court held that the disparate treatment of places of worship compared to airport gates is justified based on singing and as such the public health orders are narrowly tailored. But the evidence is that the ban on singing is not universal. There is a State exemption for the music, television, and film industries which the County has left in place. 17-ER-4385. The entertainment industry is deemed essential while religious institutions are not, other than to the extent that they operate virtually. 17-ER-4378. Of importance, the entertainment industry is allowed

to engage in singing.  In the alternative, if the ban on singing meets narrow tailoring, places of worship should nonetheless be allowed to meet to the same extent as allowed at airports, though the singing ban could remain in place.

Aside from the airport gatherings, the County completely prohibits indoor worship services.  It also created a boutique definition of gathering.  The District Court found the gatherings ban a neutral law of general applicability.  This is in error for two reasons.  First, religious entities are explicitly enumerated in a disfavored category.  There are numerous entities allowed to operate at 20% capacity whereas indoor religious services are at 0% capacity.  Second, the definition of gatherings that the County created encompasses airports as well as other activities in which the public can convene, meet, or assemble, e.g., court hearings, public transit waiting areas, lessons in a classroom, a government meeting, but those other activities are not limited as are religious services.  These exceptions result in disparate treatment of religious entities and their worship services.

## STATEMENT OF FACTS

The State and County have promulgated separate, though related, public health orders.  These will be explained in separate sections.

### State Public Health Orders

The Churches challenge California's 4-tier Blueprint for a Safer Economy and the County's public health order (1-ER-8), both of which have completely prohibited indoor gatherings of groups of people for worship.  The Churches are located in

Santa Clara County, California, and they include thousands of residents who worship in their sanctuaries. Prior to the arrival of COVID-19 on our shores, they conducted worship services for their congregations each weekend which included the traditional elements of prayer, reading from sacred texts, music, Holy Communion, and the delivery of a sermon. Like most churches in the Christian faith, such services have been practiced at all times and all places for nearly two millennia without interruption. That is, until now.

Governor Gavin Newsom proclaimed a state of emergency on March 4, 2020, in response to COVID-19. 16-ER-4245-4249. Originally detonated in China, COVID-19 exploded across the world. 16-ER-4245. It spread to Europe and then the United States by passengers traveling through airports. 14-ER-3434; 12-ER-3076; 16-ER-4221-4236; 17-ER-4295. The Governor issued Executive Order N-33-20 on March 19, which incorporates an order of the State Public Health Officer and mandates, in pertinent part:

> all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19.

16-ER-4255-4256. The following month the State clarified that "critical infrastructure" generally included Transportation and Logistics, creating a specific exception to the stay at home order for airports. 1-ER-7:19-20.

Places of worship are not listed as essential.  Instead, under a complex 4-tier system called "Blueprint For A Safer Economy," places of worship were (1) banned from meeting in their sanctuaries (Purple Tier 1), (2) significantly restricted to *the lesser of* 100 persons or 25% capacity (Red Tier 2), (3) restricted to *the lesser of* 200 persons or 50% capacity (Orange Tier 3), or (4) restricted to 50% maximum capacity (Yellow Tier 4).[1]  There is no green tier where religious assemblies can gather indoors at full capacity.

### County Public Health Orders

Per Executive Order N-60-20, the State system also allows local public health officials to subject places of worship to even greater restrictions. 16-ER-4259. The County did just that.  Worshipers were forced outdoors into the heat and smoke of summer and the cold and rain of autumn and winter.

The County promulgated a public health order addressing worship services in its *Capacity Directive*, 3-ER-418-425, and *Gathering Directive*, 14-ER-3442-3454, which are the subject of this appeal.[2]

---

[1] *Industry Guidance to Reduce Risk – Places of worship and cultural ceremonies* (updated Nov. 6, 2020). Accessed at https://covid19.ca.gov/industry-guidance/#worship.

[2] The most current iterations of the *Capacity Directive* and the *Gathering Directive* may be accessed, respectively, at https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-capacity-limitations.aspx and https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-gatherings.aspx#:~:text=Current%20Rules%20for%20Indoor%20Gatherings%20in%20Santa%20Clara%20County%3A,indoor%20gatherings%20are%20currently%20prohibited.

In its current iteration, the *Capacity Directive* reads as follows:[3]

| Business/Entity/Activity Type | Indoors | Outdoors |
| --- | --- | --- |
| Gatherings (*e.g.*, political events, weddings, funerals, worship services, movie showings, cardroom operations) | Prohibited | Allowed up to 400 people per gathering, but subject to the limitations set forth by the State, which generally prohibit all gatherings except religious services, cultural ceremonies, political protests, other gatherings allowed by a State guidance document, and outdoor gatherings of up to 3 households.<br><br>Note: All gatherings must comply with the Mandatory Directive for Gatherings, including rules for multiple gatherings. |

Numerous other business/entity/activity types are allowed at 20% capacity. These include: grocery and retail stores, shopping malls, personal care businesses (e.g., hair salons, nail care, tattoo and body art, skin care, waxing, and other hair removal), other "non-essential limited services" (e.g., pet grooming and shoe repair), indoor public transit waiting areas, all other essential and critical infrastructure facilities (including government facilities), and any other facility allowed to open to the public under State

[3] Except for a 48-hour period of time when the District Court enjoined the County pursuant to *South Bay II* requiring a 25% capacity allowance for places of worship and a very few weeks in the fall, this essential rule has been in place since March 2020.

and County orders. 3-ER-421-423.[4]

What is more, the County's *Gathering Directive* creates its own bespoke definition

of *gathering*:

> A "gathering" is an event, assembly, meeting, or convening that brings
> together multiple people from separate households in a single space,
> indoors or outdoors, at the same time and in a coordinated fashion—like
> a wedding, banquet, conference, religious service, festival, fair, party,
> performance, competition, movie theater operation, fitness class,
> barbecue, protest, or picnic. 1-ER-28 and 14-ER-3445.

The County exempts airports. The County Public Health Director explained:

> As many public health officials have noted, airports present an elevated
> risk of exposure to COVID-19 given the number of people passing
> through from different locations. . . . [T]he Public Health Department is
> not currently recommending closure of the airport given the significant
> societal harms lack of access to travel would cause. 15-ER-3950.[5]

Of further note, all parts of the County, whether incorporated or not, are under

the jurisdiction of the Santa Clara Public Health Department.[6] 16-ER-4151. Mineta

San José International Airport is within that jurisdiction and hosts large gatherings of

travelers from all over the world in the seating areas of 30 gates in 2 terminals.

---

[4] The most current iteration of the *Capacity Directive* may be accessed at
https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-capacity-limitations.aspx.
[5] "County of Santa Clara Public Health Department: Statement Regarding COVID-19 and Airports." Mar. 11, 2020. Accessed at
https://www.sccgov.org/sites/phd/news/Pages/covid-19-airports.aspx.
[6] Santa Clara County Ordinance NS 9.921. (Aug. 11, 2020) Accessed at
https://www.sccgov.org/sites/covid19/Documents/ordinance-ns-9-291.pdf.

***Churches' Response***

Most religious institutions were initially cooperative with government orders because they were led to believe the restrictions on worship would be a temporary burden.  Indeed, the pastors of the Churches worked closely with County officials to reopen churches, but to no avail.  *See* pastors' declarations at 11-ER-2803-2804; 12-ER-2964; 12-ER-2938-2939.  Instead, the State and County have engaged in a pattern and practice that continually stretches the ban on those who congregate for sacred purposes.  This has gone on for nearly a year with no foreseeable end to the County's orders that prohibit indoor worship, i.e., "This ordinance shall stay in full force and effect until repealed by the Board of Supervisors."[7]

In recent months, County officials have monitored, harassed, sued, and fined houses of worship for violating worship restrictions.  As their buildings sit abandoned and their liberties under the Bill of Rights continue to be subject to suspension, the Churches have lost patience and filed suit in the District Court seeking redress.

***Recent Ninth Circuit and Supreme Court Decisions***

The Complaint was filed just before Thanksgiving (Nov. 23, 2020).  At that time, the U.S. Supreme Court's decision in *South Bay United Pentecostal Church v. Gavin Newsom*, 590 U.S. ___ ,140 S. Ct. 1613 (2020) (*South Bay I*) was the operative law.  In his concurrence denying relief, Chief Justice Roberts explained the crucial inquiry is

---

[7] Santa Clara County Ordinance NS 9.921, EXPIRATION § 14.

whether there is a comparable secular gathering where "large groups of people gather in close proximity for extended periods of time." *South Bay I*, 140 S. Ct. at 1614 (Roberts, C.J., concurring in denial of application for emergency writ of injunction). Based on that language, the primary comparator used by the Churches at the initial filing was airport gates. That comparator remains so now, though not exclusively so.

Two days after the Complaint was filed, the Supreme Court granted emergency relief in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 590 U.S. ___ , 141 S. Ct. 63, 73 (2020). Shortly thereafter, this Court decided *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228 (9th Cir. 2020), in which it stated that *Roman Catholic Diocese of Brooklyn v. Cuomo* "arguably created a seismic shift in Free Exercise law." *Id.* at 1233. This Court found the restrictions on places of worship in Nevada inconsistent with the three-week-old decision by the Supreme Court.

The ground continued to move when six weeks later this Court found California's 0% capacity rules on religious worship in Purple Tier 1 were narrowly tailored. *South Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128 (9th Cir. Jan. 22, 2021). In light of these decisions, less than a week later in this case the lower court granted in part, and denied in part, the Churches' motion for a preliminary injunction.

But the legal landscape still shakes. One week later, the Supreme Court reversed this Court's decision in *South Bay II*.

## INTRODUCTION

Churches seek an injunction against the enforcement of government orders that foist burdensome and unconstitutional restrictions on indoor gatherings at houses of worship yet exempt gatherings at the gates of airport terminals nearly identical in terms of space, time, and number of persons. The County also has placed a complete ban on indoor worship services yet allows numerous other entities to operate at 20% capacity and airports are fully operational. Enforced by six-figure administrative fines and the threat of prosecution and incarceration, the orders place governmental restraints on First Amendment liberties never seen or imagined in this nation prior to 2020. 13-ER-3349-3358, 3385-3393. As articulated, perhaps ironically, by the Santa Clara County Deputy District Attorney, "Right now we're putting parts of the Constitution on hold. We really are. Freedom of assembly. Right to practice religion."[8] By this appeal, the Churches seek the restoration of those rights.

## ARGUMENT

Although the State and County put forward different public health orders, the results have been the same – 0% capacity for indoor worship services. The intervening case of *South Bay II* changed the indoor worship capacity as to the State,

---

[8] Katey Rusch, *How Do You Enforce a Law That Tramples the Land of the Free?*, THE NEW YORK TIMES (May 11, 2020), https://www.nytimes.com/2020/05/11/us/coronavirus-california-lockdowns.html (quoting Santa Clara County Deputy District Attorney, Angela Alvarado).

setting it at 25%. In this case on interlocutory appeal, the parties have been roiling as various courts issue decisions. Nonetheless, there are certain facts and legal findings that have become fixed and need not detain this Court for long.

- The State's rules which relegate churches to the nonessential are not neutral laws of general applicability. *Roman Catholic Diocese of Brooklyn v. Cuomo*; *South Bay II*; *Calvary Chapel Dayton Valley v. Sisolak*.

- Strict scrutiny is applied to the State's prohibitions on places of worship. *Id.*

- Curbing the COVID-19 pandemic is a compelling interest. *Id.*

- The risk factors the State uses for its 0% capacity for places of worship under Tier 1 (Purple) are not narrowly tailored. *South Bay II* in reversing *South Bay United Pentecostal Church v. Newsom*, No. 20-56358, 2021 WL 222814.

The *South Bay II* Court decided that the floor for a cap on worship services can go no lower than 25%. But the high court did not decide the ceiling. Here the Churches proffer that the ceiling should be set at the same height as the capacity allowance at airports.

## I. THE STATE AND COUNTY AIRPORT EXEMPTIONS ARE SUBJECT TO STRICT SCRUTINY.

During the pandemic, (1) unlimited "large groups of people" (2) have gathered in "close proximity" at airport gates across the State and in the County for (3) "extended periods of time." 14-ER-3574-3580. British Airways, for example, flies Boeing 787 aircraft with a seating capacity of over 350 in and out of the airport at San

José. 13-ER-3198-3200. It would be error to presume that public health officials believe airports sit as COVID-19 safe zones. They do not. As a County health office press release explains, airports are an "elevated risk" with a "number of people passing through from different locations." 15-ER-3950-3951. In addition, in excess of 5,000 Transportation Security Administration employees across the country have been confirmed to have been infected with COVID-19. 16-ER-4217-4238.[9] Despite this high volume, high risk activity, airports are exempt from State and County gathering orders and there is no closure or maximum cap.

The similarities between the faithful at worship services and passengers awaiting flights are significant in terms of time, space, and numbers. People gather for a flight much like people gather for a service. They congregate in a defined area at a specified time in advance of a scheduled event, be it a flight or a worship service. Airlines have a "minimum check-in time," 14-ER-3585, after which passengers are not guaranteed the seat for which they paid. They sit, stand, or queue up together in close proximity be it in chairs, pews, or aisles, remain together typically for one to two hours, and then exit the gate or church together. At the start of the pandemic the State and County elected not to close any airports or otherwise restrict these facilities anywhere in their respective jurisdictions. 15-ER-3950-3951.

This comparison between places of worship and airport gates falls within the

---

[9] The most current iteration of this report may be accessed at https://www.tsa.gov/coronavirus.

*South Bay I* concurrence of the Chief Justice. But under *Roman Catholic Diocese of Brooklyn v. Cuomo*, *South Bay II* and this Court's decision in *Calvary Chapel Dayton Valley v. Sisolak*, the less favorable treatment that places of worship receive in comparison to airports is all the more indefensible than that described in the *South Bay I* concurrence.

Airports have never been subjected to strict numerical or capacity-based limitations, let alone forced to close. 14-ER-3571-3573. Under the first County indoor worship ban, airports were specifically exempted from any regulation. 15-ER-3740. In contrast, religious services were and are not permitted to take place indoors merely because they are religious.

That there are a number of gatherings prohibited besides places of worship does not anchor the public health orders in a constitutionally safe inlet. "The legal question is not whether religious worship services are all alone in a disfavored category, but why they are in the disfavored category to begin with." *Calvary Chapel Dayton County v. Sisolak*, 591 U.S. ___ , 140 S. Ct. 2603, 2614 (2020) (Alito, J., dissenting)(citing *Emp't Div., Dep't of Human Res. Of Or. v. Smith*, 494 U.S. 872, 884 (1990)). "The point 'is not whether one or a few secular analogs are regulated. The question is whether a single secular analog is *not* regulated.'" *Id.* at 140 S. Ct. 2603, 2613 (Kavanaugh, J., dissenting) (quoting Laycock & Collis, *Generally Applicable Law and the Free Exercise of Religion*, 95 Neb. L. Rev. 1, 22 (2016)). Justices Alito and Kavanaugh's dissents now comprise the controlling legal standard. Here, the gates at airport terminals is that "single secular analog."

15

What is more, State and County orders did not enumerate specific types of universally applied physical conduct regardless of the venue, activity, or entity, e.g., wearing a mask, maintaining a social distance, providing hand sanitizer dispensers, or limiting numbers of persons according to square footage. Such would constitute generally applicable rules. Instead, persons in their capacity as passengers can congregate at crowded air terminal gates, but those same persons as congregants cannot meet at their house of worship.

In sum, because the gathering restrictions exempt gates at airports, the State and County orders are not universally applied to all persons, in all places, at all times. Thus, the orders are not generally applicable. Like a law that is not neutral on its face, an order that is not generally applicable does not receive the benefit of rational basis review. *Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 533 (1993).

### A. The State's Public Health Orders Are Not Narrowly Tailored Because They Exempt Airport Gates Which Are A Similarly Situated Comparator to Church Services.

It is evident, as the District Court found (1-ER-15-17), that the exemptions for airport gates are subject to strict because they are not generally applicable. Further, it is equally evident that slowing the spread of COVID-19 constitutes a compelling state interest. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. at 66-67. The question remains as to whether State and County exemptions for airports are narrowly tailored. This is where the Churches part company with the District Court.

### i. *The State's Claim of Narrow Tailoring*

The State claimed in the lower court that its restrictions were based on "objective data and a science-driven risk assessment process" and thus are narrowly tailored. 1-ER-18. This process was accepted by this Court as satisfying narrow tailoring. *South Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, ___ (9th Cir. Jan. 22, 2021). Bound to that decision, the District Court was obliged to follow this Court's holding.

Two weeks later the Supreme Court reversed in *South Bay II*. Summarizing the State's process, Justice Gorsuch writes, "The State offers essentially four reasons . . . It says that religious exercises involve (1) large numbers of people mixing from different households; (2) in close physical proximity; (3) for extended periods; (4) with singing." *South Bay II*.[10] The sum of the matter is the Supreme Court determined that California's rules and reasoning for the many entities and activities allowed at 25% capacity were not narrowly tailored. In this case on appeal, these four "science-driven risk assessment" reasons as applied to airports fail the requirements of narrow tailoring for the same reason they were found wanting in the activities and entities reviewed by the Supreme Court in *South Bay II*. Because airport gates are far more alike as a comparator to places of worship than the entities compared by the *South Bay*

---

[10] The State enumerates seven risk factors. 1-ER-17-18. For a more detailed description, see, *South Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, __. Justice Gorsuch combined some of those factors, hence compressing them to a more easily digestible set of four as quoted above.

*II* Court in terms of time, space, and numbers, it is all the more reason why the State cannot demonstrate that its rules are narrowly tailored.

### ii. *The County's Claim of Narrow Tailoring*

The County's attempt at narrow tailoring is weaker than that proffered by the State. The County alleges that its gathering ban merely "imposes additional restrictions that are proportionate to the risk of transmission associated with different activities." 3-ER-532. For this reason, indoor worship services have been deemed an "extremely high-risk activity" and are banned based upon the following factors: they are activities where people "gather, speak, and sing in close proximity for an extended period of time." 3-ER-532. This is essentially a simplified version of the State's risk factors explained by Justice Gorsuch.

First, the singing ban is in force in California for places of worship. *South Bay II.* Second, there are many other instances where individuals gather – indoors – for extended periods of time and speak to each other in the County. Examples allowed under the *Capacity Directive* include activities at bus stations, grocery stores, retail shops, personal grooming services and, notably, airport gates. Each of these activities involves "different households gathering and mixing indoors and remaining in close proximity for extended periods of time." 3-ER-532-533. Yet masking and social distancing is sufficient in each of those instances. To circumvent this contradiction, the County has created a customized definition of "gathering" to gerrymander and ban only certain indoor "gatherings." It cannot reasonably be said that the County

has done so because of their stated factors for flagging "extremely high-risk activity" in light of the numerous exceptions to its definition of a "gathering." Multiple comparable indoor activities are not selected for harsher treatment. A total ban on disfavored indoor gatherings—including worship services defined by their content—is the antithesis of narrow tailoring.

## B. The Basis for the State and County Exceptions for Gatherings at Airports Due to Singing at Churches is Belied by the Fact That These Jurisdictions Create Singing Exceptions in Other Industries.

The primary reason the State and County put forward regarding narrow tailoring is the phenomena of singing which occur at worship services but not at airports. First, it stands to reason that the coronavirus did not come to this country through congregants singing in sacred places but from passengers traveling through airports. The governments constant disparagement of worship services as "super spreader events" is ironic in view of the lax standard for airports which were the portal through which this health disaster entered this country. Airports did not remain open because they are safe but because the State and County decided they were essential and places of worship are not. Second, even if singing at places of worship is an inherently dangerous activity, narrow tailoring and use of the least restrictive means would be to restrict singing but allow gatherings, nonetheless. Instead, the State and County prohibited **both** gathering and singing at religious venues but exempted gathering at airports. Since the justification they created for

purposes of defending against this lawsuit centers primarily around singing, the Churches address that issue here.

The State and County have prohibited singing at indoor worship gatherings, yet an exemption was created for the entertainment industry. The entertainment industry has been placed on a preferred list the State asserts is necessary "to maintain continuity of operations of essential critical infrastructure." 14-ER-4385. Under the heading **Music, film, and TV** in the State's Blueprint it reads, "This industry can open with modifications. Music, TV, and film production may resume, subject to approval by county public health officers." Similarly, **Music production** – "Can open with modifications." 17-ER-4334-4341. The County has chosen not to ban either of these entertainment sectors or impose any additional restrictions. As such, the discussion that follows of the State's rules and exemptions applies to the County as well.

The State has prohibited singing indoors in churches. "[A]ctivities such as singing and chanting negate the risk-reduction achieved through six feet of physical distancing. Places of worship must therefore discontinue indoor singing and chanting activities." 16-ER-3985. Despite the fact that the State considers singing far too dangerous to allow it as an integral part of the free exercise of religion, the State allows singing indoors for purposes of music, film, and TV production.

The State has designated an extensive 23-page list of "Essential Critical Infrastructure Workers" it has characterized as necessary "to help state, local, tribal,

20

and industry partners as they work to protect communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security." 17-ER-4362-4385. As inconceivable as it may seem, the state has included in its list the "[w]orkers supporting the entertainment industries, studios and other related establishments, provided they follow COVID-19 public health guidance around physical distancing." 17-ER-4385. It is difficult to imagine how the entertainment industry workers "protect communities," "ensure[] continuity of functions critical to public health and safety," or "ensure[] continuity of functions critical . . . to economic and national security."

Along with designating the entertainment industry as "essential," the State admits it allows singing as part of the purportedly essential work of music, film, and TV production. In a declaration the State submitted in the District Court in *South Bay United Pentecostal Church v. Newsom*, the State's declarant stated: "Singing in larger groups is permitted but only under with [*sic*] additional protections to prevent the spread of COVID." Request for Judicial Notice, Exh. 1, p. 2, ¶ 6; p. 10 at h. Surely, if the state can find a way to prevent the spread of COVID-19 to enable the entertainment industry, of all things, to continue to operate with indoor singing, it can find a way to prevent the spread of COVID-19 to enable churches sing; singing is, after all, an integral part of the free exercise of religion. 11-ER-2721-2722, 2740, 2742-2743, 2780-2783, 2820-2821, 2827-2829; 12-ER-2860, 2865, 2905, 2935-2936, 2943-2946, 2962-2963, 2968-2969. Because the State allows the entertainment

industry to sing indoors but prohibits churches from doing so, the State's prohibition cannot possibly survive strict scrutiny. "Of course, if a chorister can sing in a Hollywood studio but not in her church, California's regulations cannot be viewed as neutral." *South Bay II*, (Barrett, J., concurring). In view of the evidence just cited, Justice Barrett's concerns are well taken.

Finally, the State has put forward a position in the courts that cannot be easily squared with some of its written rules and guidance on singing. The California Departments of Public Health and Industrial Relations issued a guidance for places of worship. The guidance provides in part, "Places of worship must therefore discontinue indoor singing and chanting activities." It further reads, "Discontinue singing (in rehearsals, services, etc.) . . ." 16-ER-3985, 3995. These same entities also published a checklist for places of worship. The checklist states, "Discontinue singing, group recitation, and other practices and performances, **or ensure physical distancing greater than six feet**." 16-ER-4092 (emphasis added).

These two guidance publications are self-contradictory. A party cannot create confusion and then seek to benefit from it. In like manner, Justice Gorsuch noted that "[t]here is some confusion over what rules actually apply to Hollywood but I would not allow the government officials who created California's complex regime to benefit from its confusing nature." *South Bay II*, fn. 2 (Gorsuch J., concurring).

## C. The Lower Court Failed to Apply the Least Restrictive Means Element to Narrow Tailoring.

The State and County cannot carry their burden demonstrating that it uses the least "restrictive means of achieving some compelling state interest" for two reasons. *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981).

First, the County and State have put forward a heightened "fool-proof protection" standard for places of worship that requires them to eliminate the risk of all transmission as a precondition for indoor worship and singing. 8-ER-1967. This zero- risk standard is impossible to meet and is not required of airports or the music, film and entertainment industry or other entities.

They concede the CDC-approved "multipronged application of evidence-based strategies" (i.e., face coverings, social distancing, increased hygiene, etc.) reduces the risk of transmission of the virus (4-ER-718), as do restrictions on capacity (7-ER-1704), and they acknowledge these measures are "very clearly shown to be effective at stemming the spread of COVID-19." Yet, they prohibit worship indoors as these mitigation measures "do not eliminate the risk" (3-ER-528; 4-ER-835; 4-ER-836) and "do not prevent all transmission." 3-ER-530; 4-ER-851.

Beyond imposing the disparate heightened standard for purposes of worship, the State and County have banned singing and chanting "given that none of the [mitigation] measures provides fool-proof protection." 8-ER-1967. Although the State and County acknowledge such measures, including wearing face coverings while

singing, "significantly" decrease the risk of transmission, singing indoors is prohibited as the measures do not "completely eliminate" the risk or "prevent" all transmission. 4-ER-724; 4-ER-717; 4-ER-767; 7-ER-1700. This is far from the least "restrictive means" standard that the State and County must constitutionally meet.

Second, even if this Court were inclined to accept the proposition that there is a content neutral universal ban against singing in all industries, the least restrictive means would not be to set places of worship at 0% capacity for indoor worship. It would be to allow places of worship to meet, yet prohibit singing. Such a rule, though it would continue to cause a particular burden to the Churches, constitutes a less restrictive means than a complete prohibition on indoor worship.

### D. Both the State and County Have Jurisdiction over Airports.

The State's reliance on *Montalvo v. Spirit Airlines, et al.,* 508 F.3d 464 (9th Cir. 2007) to excuse disparate treatment due to federal preemption is misplaced. That case held the Federal Aviation Act to cover fight rules. *Id.* at 471. The Act itself says nothing in regards to control of airports in general and gates in particular with the sole exception that no order, regulation or procedure can be promulgated that negatively impacts the accessibility of handicapped individuals. 49 U.S.C. § 40103(a)(2). The guidance explicitly provides that state and local jurisdictions retain authority to restrict individuals when they are in the airport. "The guidance here is not legally binding in its own right . . . [c]onformity with this guidance, as distinct from existing statutes, regulations, is voluntary only. . . ." 16-ER-1264. Further, state and local jurisdictions

"may wish" to consider "[t]hese suggestions." 6-ER-1272. The District Court was correct that this is not the language of preemption. Citing the State and County's own evidence, the District Court correctly found that "the federal government does not categorically prohibit local governments from imposing public health ordinances on airports; rather, it has indicated that any such measures must be approved by the FAA." 1-ER-20:11-13. As such, "It does not follow that the State and County cannot impose *any* public health measures on airports at all." 1-ER-20:16-17.

Tellingly, up until this litigation, neither the State nor County have made claims that the airport exemption is based on a lack of jurisdiction. Instead, they exempted airports from restriction because they deem them as essential. 17-ER-4300; 16-ER-4173; 15-ER-3740; 3950.

## II. THE COUNTY'S BAN ON INDOOR WORSHIP SERVICES IS SUBJECT TO STRICT SCRUTINY BECAUSE IT IS NEITHER NEUTRAL NOR GENERALLY APPLICABLE.

The County public health orders that completely prohibit indoor worship services are not neutral laws of general applicability. Beginning with the challenged text, the County has promulgated the *Capacity Directive*, 3-ER-418-425, and *Gathering Directive*. 14-ER-3442-3454. The *Capacity Directive* reads in chart form as follows:

| Business/Entity/Activity Type | Indoors | Outdoors |
|---|---|---|
| Gatherings (*e.g.*, political events, weddings, funerals, worship services, movie | Prohibited | Allowed up to 400 people per gathering, but subject to the limitations set forth by the State, which generally prohibit all |

| | | |
|---|---|---|
| showings, cardroom operations) | | gatherings except religious services, cultural ceremonies, political protests, other gatherings allowed by a State guidance document, and outdoor gatherings of up to 3 households. |

The District Court Order maintains that these directives "appl[y] regardless of whether the event has a religious or secular purpose" (1-ER-27) and thus is subject to and survives rational basis review. 1-ER-28. Not true.

First, both the *Capacity Directive* and *Gathering Directive* identify a specific religious activity, i.e., "Gatherings—worship services" (3-ER-421), "'gatherings' is an event, assembly, or convening—like a religious service" 14-ER-3445. The operative language of the County public health order restricts a religious activity by explicit reference to the conduct's sacred character. *McDaniel v. Paty*, 435 U.S. 618 (1978). Because the restriction enumerates religious practice, conduct, belief, or motivation "without a secular meaning discernable from the language or context," it falls short of "facial neutrality." *Lukumi*, 508 U.S. at 533.

Second, the *Capacity Directive* subjects religious activities and entities to especially harsh treatment in view of other businesses/entities/activities/types. Consider these indoor examples:

- grocery and retail stores at 20% capacity—worship services 0%

- personal care businesses at 20% capacity—worship services 0%

- public transit waiting areas at 20% capacity—worship services 0%

- "non-essential" limited services at 20% capacity—worship services 0%

- all essential and critical infrastructure facilities and government facilities of any kind at 20% capacity—worship services 0%

- any other facility allowed to open to the public under State and County orders at 20%—worship services 0%

3-ER-421-423. In addition to the above, airports operate at 100% capacity but indoor worship services are banned.

The County's allowance for exceptions stands as the problem. This is not only true of gatherings at airport gates, but a hearing in a courtroom, a lesson given in a classroom, a government meeting, or waiting for transit. All such activities are an "event, assembly, meeting, or convening that brings together multiple people from separate households in a single space." 14-ER-3445. Yet a worship service is an assembly or meeting that is *verboten*. "When a State so obviously targets religion for differential treatment, our job becomes that much clearer." *South Bay II*, 592 U.S. ___ (Gorsuch, J., concurring).

The County argues that "listing worship services as one of many examples of activities captured by the definition of gatherings does not evidence any discriminatory or even disparate treatment of worship services." 1-ER-27. This is a *non sequitur*. The premise is that listing an activity as an example of something that is

prohibited is not the same as entering that activity on a prohibited list. It remains inescapable that under either circumstance, the identical activity is proscribed. The analysis in *Lukumi* would be no different if the City of Hialeah had defined *unlawful killing of animals* in the municipal code as follows:

> Except for purposes of the consumption of food, the "unlawful killing of an animal" is defined as the infliction of injury on a nonhuman creature with the intent of the cessation of biological function – like religious animal sacrifice, skinning alive, hanging by the throat until breathing ceases, immolation.

Use of the word **like** in the hypothetical definition above or in the County's definition of *gathering* (e.g., "like a religious service") fails to eradicate the disparate treatment of religion. Whether meant as illustrative or not, all of the enumerated activities appearing on the definition are in fact banned. The County never explicates how setting forth a list of banned activities is fundamentally different than drafting a definition that provides examples of activities that the government bans.

Unlawful discrimination, which stands as the antithesis of neutrality, involves making a distinction between a group of people, an entity, or related activity based upon a protected characteristic (e.g., religion) coupled with the imposition of special disabilities on that basis. *Lukumi,* 508 U.S. at 533 citing *McDaniel*, 435 U.S. 618 (1978). In *Lukumi,* a municipality banned animal sacrifices. Here, the County bans indoor worship services. This indisputably triggers strict scrutiny review. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. at 67 citing *Lukumi,* 508 U.S. at 546.

The District Court committed error by viewing the *Gathering Directive* as "not impos[ing] any express restrictions on 'places of worship.'" 1-ER-26. This reads "worship services" out of the text. The plain meaning of the *Gathering Directive* is that it explicitly applies to worship services. It requires little explanation that places of worship sit as the venue for worship services. Worship services are not conducted at city hall, public transit waiting areas, or grocery stores. Rather, they occur at churches, synagogues, temples, and mosques. Indeed, the *Capacity Directive* states that under its boutique definition, prohibited indoor "gatherings" explicitly includes "worship services." 3-ER-421. What is more, the *Gathering Directive* most clearly gives preferential treatment to a host of other activities. Many of these are the very ones that the Supreme Court found problematic in *Roman Catholic Diocese of Brooklyn v. Cuomo* and *South Bay II*, e.g., grocery stores, transportation facilities, liquor stores, airports, body piercing, and hair salons.

Turning specifically to airports, the allowance for 100% capacity is particularly troubling. These restrictions are underinclusive because they do not reach passengers at airport gates. The District Court's analysis in this regard is not convincing. The Court Order states that groups of people awaiting flights at airport gates do not fall under the definition of a "gathering" because they do not "bring[] together multiple people from separate households in a single space . . . at the same time and in a coordinated fashion." 1-ER-27, quoting the *Gathering Directive*. The District Court also asserts that persons in places of transit are "independent" and "asocial." 1-ER-21-22.

The notion that worshipers are more social than travelers may be true upon entrance and exit of a religious sanctuary, but not during the service itself. Worshipers stand, sit, and kneel but typical religious services do not entail conversations with nearby congregants during the meeting. Before the service begins or after the benediction, fellowshipping with other believers occurs. However, under those circumstances health concerns can be mitigated by use of the same social distancing and masking rules observed in stores, government offices, and airports.

Beyond this, there are additional problems with the District Court's analysis. The definition of "gathering" the County has created excludes activities and entities the Supreme Court has found to be proper comparators to places of worship, e.g., big box stores, acupuncture facilities, garages, manufacturing plants, transportation facilities, camp grounds, bus stations, airports, laundromats, banks, hardware stores and liquor shops (*Roman Catholic Diocese of Brooklyn v. Cuomo*), retail operations, shopping malls, salons, bus terminals (*South Bay II*), retail, stores, restaurants, casinos, bowling alleys, arcades, miniature golf, amusement parks, theme parks, fitness facilities, museums, zoos. *Calvary Chapel Dayton Valley v. Sisolak.* The County's essential strategy is: "We're going to say that those gatherings aren't 'gatherings' according to our self-created definition."

What is more is that exempting airports from gatherings as the County defines them is inconsistent with its own definition—the "bringing together [of] multiple people from separate households in a single space . . . at the same time and in a

coordinated fashion." 14-ER-3445. This is exactly what occurs at the gate of an

airport. Ticketed passengers from multiple separate households are explicitly directed

to a designated area, lining up to board by row number, section, or other grouping at

the gate. This is the very definition of a "gathering" under the *Gathering Directive* as

contained within the County Orders. *Id.*

Further, the record is clear that at the time the County first promulgated the

*Gathering Directive*, it never claimed an airport falls outside of the definition. Instead,

the County *exempted* airports from its definition of gatherings, stating "[a] gathering

does not include . . . airports . . . ." 15-ER-3740. As it explained, "the Public Health

Department is not currently recommending closure of the airport given the significant

societal harms lack of access to travel would cause . . . ." 15-ER-3950. The evidence

is not subject to reasonable dispute that airports were not exempted because they are

safe.[11] They were exempted because the State and County considered them *essential* or

*critical* entities. This is admitted. Airports were left open "given the significant

societal harms lack of access to travel would cause." *Id.*

---

[11] Just five days before the issuance of the first County worship ban and the shuttering of churches, the County Public Health Director released a statement directly addressing airports: "As many public health officials have noted, **airports present an elevated risk of exposure to COVID-19 given the number of people passing through from different locations**." *CPHD Statement Regarding Airports* (Mar. 11, 2020) (emphasis added). Accessed at https://www.sccgov.org/sites/phd/news/Pages/covid-19-airports.aspx.

The County has deemed airports as a preferred entity. "[O]nce [the government] creates a favored class of businesses . . . [it] must justify why houses of worship are excluded from that favored class." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. at 73 (Kavanaugh, J., concurring). This leads to the indisputable conclusion that strict scrutiny must apply to the County's *Capacity Directive* and *Gathering Directive*.

Here the County's orders related to gatherings "fail to prohibit nonreligious conduct" at the airport or other businesses "that endangers these [public health] interests in a similar or greater degree" than the religious conduct of sitting in a church. *Lukumi*, 508 U.S. at 543. The public health orders that have left church buildings abandoned throughout the County are thus overinclusive in that they prohibit more activity than is necessary to prevent the spread of COVID-19. On the other hand, by not reaching passengers at airports the public health orders are underinclusive. Thus, these orders fall short of the requirements for narrow tailoring.

## III. THE CHURCHES FACE IRREPARABLE HARM BY THE CONTINUED EXCLUSION OF CONGREGANTS FROM INDOOR WORSHIP SERVICES

The Churches have endured over eleven months without the ability to gather for religious worship, under threat of civil and criminal action. "The deprivation of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). As the Supreme found,

"[t]here can be no question that the challenged restrictions, if enforced, will cause irreparable harm." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 14 S. Ct. at 67. This Court came to the same to conclusion in *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d at 1234.

## IV. THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST MERGE.

The State and County defendants are government entities. As such, the balance of equities and public interest factors for a preliminary injunction merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

On application for emergency writs of injunction, the Supreme Court reviewed public health orders from both New York and California and found the balance of equities and public interest factors to weigh in favor of the religious institutions. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 14 S. Ct. at 65, *South Bay II* at ___. The standard of review for these types of writs (28 U.S.C. § 1651(a)) are extremely high in requiring that relief be "indisputably clear" when in an interlocutory posture at the highest court. *Turner Broadcasting System, Inc. v. FCC*, 507 U.S. 1301, 1302 (1993) (Rehnquist, C.J., in chambers). Of course, on an interlocutory appeal in the Court of Appeals, the standard is less demanding. In either event, it follows then that the balance of hardships and public interest factors in this case also should be found in favor of the Churches as it was in *Roman Catholic Diocese of Brooklyn v. Cuomo* and *South Bay II*. The primary difference between this case and those matter before the Supreme Court is that the Churches have endured a longer span of time without the

opportunity of indoor worship than the *Roman Catholic Diocese of Brooklyn v. Cuomo* and *South Bay II* litigants.

Given their showing of the facially and as-applied invalidity of the public health orders, the Churches necessarily have demonstrated that leaving those orders in place for even a brief period of time "would substantially chill the exercise of fragile and constitutionally fundamental rights," for many thousands of parishioners who attend the Churches and thereby constitute an intolerable hardship. *College Republicans at San Francisco State University v. Reed*, 523 F. Supp. 2d 1005, 1011 (N.D. Cal. 2007) (citing *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 973-74 (9th Cir. 2002).

The Churches do not question the importance of health and safety. Public health officials can still impose **reasonable** health and safety requirements on places of worship. As explained above though, the Supreme Court does not consider a complete ban on indoor worship as reasonable. This is what the Churches have encountered for the vast majority of time during the last 11 months. The Churches are prepared to follow all reasonable safety precautions and social distancing measures equal to those imposed on airports and numerous other preferred businesses. "California already trusts its residents and any number of businesses to adhere to proper social distancing and hygiene practices." *South Bay Pentecostal*, 140 S. Ct. at 1615 (Kavanaugh, J., dissenting). For whatever reason, the State and County does not trust the faith community to worship safely.

This Republic can come through even the most devasting of pandemics. But the Republic cannot survive the loss of the Bill of Rights. Unquestionably, neither the State nor County can have "a legitimate interest in enforcing . . . unconstitutional" public health orders. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted). Therefore, the balance of equities and public interest tip in the most sharp and profound manner in the Churches' favor. "[I]t is time—it is past time" for the judiciary to restore core liberties to these Churches. *Roman Catholic Diocese of Brooklyn v. Cuomo*, (Gorsuch, J., concurring).

## CONCLUSION

The Constitution is the supreme law of the land. The County and State disagree. They argue for a pandemic exception to the free exercise of religion. In the words of one County official, "we're putting parts of the Constitution on hold. We really are."[12] 13-ER-3204-3206. When the Bill of Rights was ratified, the People's representatives viewed it as a restraint on the government—not deference to it. As such, the judiciary cannot "shelter in place when the Constitution is under attack." *South Bay II*, (Gorsuch, J., concurring). The Churches request this Court to zealously

---

[12] Katey Rusch. "How Do You Enforce a Law That Tramples the Land of the Free?" *The New York Times*, May 11, 2020, quoting Santa Clara County Deputy District Attorney, Angela Alvarado. Accessed at https://www.nytimes.com/2020/05/11/us/coronavirus-california-lockdowns.html.

and jealously protect First Amendment liberties and enjoin this overreach by the State

and County.

Dated: February 26, 2021

s/ Kevin Snider
Kevin T. Snider, *Counsel of Record*
Emily C. Mimnaugh
PACIFIC JUSTICE INSTITUTE
P.O. Box 276600
Sacramento, CA 95827
Tel.    (916) 857-6900
Email: ksnider@pji.org
        emimnaugh@pji.org

Marlis McAllister
McALLISTER LAW GROUP
P.O. Box 756
Pine Grove, CO 80470
Tel.    (650) 346-3792
E-mail: marlis@mcallisterlaw.net

Sharonrose Cannistraci
CANNISTRACI LAW FIRM
236 N. Santa Cruz, Ave., Suite 217
Los Gatos, California 95030
Tel.    (408) 307-5662
E-mail: cannistracilaw@gmail.com

## STATEMENT OF RELATED CASES

There are no related cases.

## CERTIFICATE OF TYPE SIZE AND STYLE

This Brief is composed in 14-point Garamond type.

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is proportionately spaced, has a typeface of 14 points or more and contains no more than 14,000 words. According to Microsoft Word's "Statistics," this document contains 8,493 words.

February 26, 2021

s/ Kevin Snider
Kevin T. Snider
Attorney for Plaintiffs/Appellants

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and Ninth Cir. R. 25-5(e) I hereby certify that on March 1, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Kevin Snider